CATHERINE B. WOLFF *v.* FREDERICK WOLFF

[No. 1274, September Term, 1977.]

*Decided July 17, 1978.*

The cause was argued before THOMPSON, DAVIDSON and MELVIN, JJ.

*Harold Buchman,* with whom was *Barbara Mello* on the brief, for appellant.

*Steven A. Skalet,* with whom was *E. David Harrison* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.*

This appeal is from an order of the Circuit Court for Montgomery County, dated November 14, 1977, sustaining the preliminary objection of Frederick Wolff (appellee) to the Bill of Complaint to Enforce Foreign Decree filed by Catherine B. Wolff (appellant). The sole issue presented by this appeal is whether the lower court was correct in sustaining the preliminary objection. We think the lower court erred, and will reverse and remand with instructions that the preliminary objection be overruled.

On August 4, 1977, appellant, a resident of London, England, filed in the Circuit Court for Montgomery County a Bill of Complaint to Enforce Foreign Decree, praying that the court assume jurisdiction and enforce the alimony provisions of an English divorce decree dated April 14, 1976. On September 26, 1977, appellee, a resident of Montgomery County, Maryland, filed a preliminary objection to the bill of complaint on the grounds of lack of jurisdiction over the person and lack of jurisdiction over the subject matter. *See* Md. Rule 323 a. On November 14, 1977, the court found that it "lacks both subject matter and personal jurisdiction" and sustained the preliminary objection, dismissing the bill of

---

* Note: *Certiorari* granted, Court of Appeals of Maryland, September 26, 1978.

complaint without leave to amend. Appellant noted a timely appeal to this Court.

We reiterate that the sole issue for our consideration is whether the lower court was correct in determining that it lacked both subject matter and personal jurisdiction, and thus whether it was correct in sustaining appellee's preliminary objection which raised those defenses. We specifically do not consider the sufficiency of the substance of the bill of complaint, *see* Md. Rule 345, or whether the relief prayed in the bill should ultimately be granted.

Turning first to the issue of whether the Circuit Court for Montgomery County had jurisdiction over appellee's person, we think it clear that the court had such jurisdiction. Appellee was personally served with process in Maryland and there is no allegation that such service was procured by fraud, trickery or artifice. These facts alone are sufficient to overcome a defense of lack of jurisdiction over the person.[1] *In re Karol,* 11 Md. App. 400, 274 A. 2d 407 (1971). *See also Altman v. Altman,* 282 Md. 483, 386 A. 2d 766 (1978). *See generally* 4 Wright & Miller, *Federal Practice and Procedure,* §§ 1061 *et seq.* (1969). The real issue in this case is whether the Montgomery County Circuit Court had jurisdiction to grant the relief prayed in appellant's bill of complaint; that is, whether the circuit court had jurisdiction over the subject matter. We turn, then, to that issue.

In facing this issue, we look first to the statute upon which the lower court based its opinion that it lacked both personal and subject matter jurisdiction. Md. Ann. Code, Cts. & J. Proc. Art., § 10-703 (1974) (entitled the "Uniform Foreign Money-Judgment Recognition Act") provides that:

> "Except as provided in § 10-704, a foreign judgment meeting the requirements of § 10-702 is conclusive between the parties to the extent that it grants or denies recovery of a sum of money. The

---

1. Jurisdiction over the person involves, "[T]he court's ability to exercise its power over an individual for the purpose of adjudicating his rights and liabilities stemming from a particular transaction or event . . . ." 4 Wright & Miller, *Federal Practice and Procedure,* § 1350 at 543 (1969).

foreign judgment is enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit."

"Foreign judgment" is defined in § 10-701 (b) as "any judgment of a foreign state granting or denying recovery of a sum of money. *It does not mean a judgment for taxes, fine, or penalty, or a judgment for support in matrimonial or family matters.*" (Emphasis supplied). Because the bill of complaint in the instant case seeks enforcement of the alimony provisions of a foreign divorce decree, and because the Act specifically excludes from the definition of foreign judgments, judgments for support[2] in matrimonial or family matters, the lower court apparently concluded that the legislature intended that the court lack jurisdiction to recognize or enforce[3] the alimony provisions of a foreign divorce decree. We do not believe the legislature intended such a result.

In our view, because judgments for support in family or matrimonial matters are excluded from the definition of judgments to which the Act applies, the Act neither provides a jurisdictional basis for the recognition or enforcement of the alimony provisions of foreign divorce decrees, nor *prevents* such recognition or enforcement on a jurisdictional basis other than that provided for in the Act. This is so because the Uniform Foreign Money-Judgments Recognition Act is *not* a statute which purports to apply to *all* foreign money-judgments and then allow for recognition of only

---

2. We think valid the assumption implicit in the trial judge's ruling that the word "support" as used in the Act means both support for the child (*i.e.,* child support) and support for the wife (*i.e.,* alimony). Thus a judgment for alimony is also excluded, by the terms of the Act, from the definition of "foreign judgment".

3. The questions of whether a court should recognize a foreign decree, and whether it should go further and use equitable remedies to *enforce* a decree once recognized are, of course, two separate and distinct lines of inquiry. Clubb v. Clubb, 402 Ill. 390, 399, 84 N.E.2d 366, 371 (1949). *See also* McCabe v. McCabe, 210 Md. 308, 312, 123 A. 2d 447 (1956); Zalduendo v. Zalduendo, 45 Ill. App. 3d 849, 4 Ill. Dec. 450, 360 N.E.2d 386, 390 (1977); McElroy v. McElroy, 256 A. 2d 763 (Del. Ch. 1969); Golomb, *Recognition of Foreign Money Judgments: A Goal-Oriented Approach,* 43 St. Johns L. Rev. 604, 607 (1969). Enforcement, however, necessarily comprehends recognition. *See* Note, *Reciprocal Recognition of Foreign Country Money Judgments: The Canada-United States Example,* 45 Fordham L. Rev. 1456, 1457 n. 6 (1977).

some. Rather, the Act, by its definition of "foreign judgment", applies only to certain types of foreign money-judgments, and does not apply to others. To those foreign money-judgments which are excluded from the scope of the Act, the legislature simply has not spoken. We do not think this silence can be construed as evidencing an intent that such judgments never, under any circumstances, be accorded recognition.

We note that § 10-707 of the Act provides that "[t]his subtitle does not prevent the recognition of a foreign judgment in situations not covered by this subtitle." While this "saving clause" must be construed as applying only to foreign judgments as defined in the Act (*i.e.*, not to judgments for support in family or matrimonial matters), it does evidence an intent that the Act be expansive rather than limiting in scope. Thus, in his article on the Uniform Foreign Money-Judgments Recognition Act, Professor A. Homburger of the State University of New York at Buffalo, Faculty of Law and Jurisprudence, states:

> "The act applies 'to any foreign country judgment that is final and conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal.' Judgments for taxes, fines and penalties, and for support in matrimonial or family matters are excluded from the scope of the Act. However, the Act contains a general saving clause which provides that '[t]his Act does not prevent the recognition of a foreign judgment in situations not covered by this Act.' Despite the obscure wording of the clause, its intent is clear. The draftsmen did not wish to fetter the requested court's power to recognize judgments which fall *outside* the scope of the Act; nor did they wish to discourage the application of more liberal standards than those prescribed for judgments *within* its scope. As the Commissioner's Prefatory Note to the Uniform Act states: 'the Act makes clear that a court is privileged to give the judgment of the

court greater effect than it is required to do by the provisions of the Act.' Reading the saving clause broadly, it follows that New York, for example, could continue its current practice of recognizing foreign support decrees which are excluded from the scope of the Act; but it could also, in a proper case, give foreign judgments within the scope of the Act a more extensive res judicata effect than the Act requires." A. Homburger, *Recognition and Enforcement of Foreign Judgments. A New Yorker Reflects on Uniform Acts,* 18 Am. J. Comp. L. 367, 370-71 (1970) (Emphasis in original).

The non-limiting intent of the Act is also emphasized by Professor B. Kulger, Rutgers School of Law, in her article in the Buffalo Law Review:

"Subsection 2 limits, rather than defines, the word 'judgment' as it is used in the act, so that recourse to existing law is necessary. The Act is restricted to certain 'judgments' which grant or deny recovery for a sum of money to the exclusion of fines, taxes, penalties, or support in matrimonial or family matters. Although New York does not enforce foreign fiscal and penal judgments, it has granted recognition and enforcement to foreign support decrees. The Act will not prevent continued recognition and enforcement of judgments not covered by its provisions." B. Kulzer, *Recognition of Foreign Country Judgments in New York: The Uniform Foreign Money Judgments Recognition Act,* 18 Buffalo L. Rev. 1, 9 (1969).

*See also* Ernster, *Recognition and Enforcement of Foreign Money-Judgments: A Clear Position for New Jersey,* 22 Rutgers L. Rev. 327, 330 (1968).

Our conclusion that the Uniform Foreign Money-Judgments Recognition Act does not prevent the courts of this State from recognizing or enforcing the alimony

provisions of a foreign divorce decree is also fortified by the Commissioner's Prefatory Note to the Act:

> "In most states of the Union, the law on recognition of judgments from foreign countries is not codified. In a large number of civil law countries, grant of conclusive effect to money-judgments from foreign courts is made dependent upon reciprocity. Judgments rendered in the United States have in many instances been refused recognition abroad either because the foreign court was not satisifed that local judgments would be recognized in the American jurisdiction involved or because no certification of existence of reciprocity could be obtained from the foreign government in countries where existence of reciprocity must be certified to the courts by the government. Codification by a state of its rules on the recognition of money-judgments rendered in a foreign court will make it more likely that judgments rendered in the state will be recognized abroad.

> "The Act states rules that have long been applied by the majority of courts in this country. In some respects the Act may not go as far as the decisions. The Act makes clear that a court is privileged to give the judgment of the court of a foreign country greater effect than it is required to do by the provisions of the Act. In codifying what bases for assumption of personal jurisdiction will be recognized, which is an area of the law still in evolution, the Act adopts the policy of listing bases accepted generally today and preserving for the courts the right to recognize still other bases. Because the Act is not selective and applies to judgments from any foreign court, the Act states that judgments rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law shall neither be recognized nor enforced." 13 Uniform Laws Annotated 269.

Thus the Uniform Foreign Money-Judgments Recognition Act was intended to promote principles of international comity by assuring foreign nations that their judgments would, under certain well-defined circumstances, be given recognition by courts in states which have adopted the Uniform Act. As reciprocity is generally an important consideration in determining whether the courts of one country will recognize the judgments of the courts of another, *see Hilton v. Guyot,* 159 U. S. 113 (1895); C. Peterson, *Foreign Country Judgments and the Second Restatement of Conflict of Laws,* 72 Col. L. Rev., 220, 233-36 (1972); J. Wigmore, *The Execution of Foreign Judgments: A Study in the International Assimulation of Private Law,* 21 Ill. L. Rev. 1, 7 (1926); E. Lorenzen, *The Enforcement of American Judgments Abroad,* 29 Yale L. J. 188 and 268 (1919-20), the certainty of recognition of those judgments provided for by the Act will hopefully facilitate recognition of similar United States' judgments abroad. Note, *Reciprocal Recognition of Foreign Country Money Judgments: The Canada-United States Example,* 45 Fordham L. Rev. 1456, 1489 n. 196 (1977). Note, *The Uniform Money-Judgments Recognition Act,* 64 Mich. L. Rev. 308, 316-17 (1965). The Act, therefore, delineates a *minimum* of foreign judgments which *must* be recognized in jurisdictions which have adopted the Act, and in no way constitutes a *maximum* limitation upon foreign judgments which *may* be given recognition apart from the Act.

The reason for the exclusion of judgments for support in matrimonial or family matters from the scope of the Act is clear. The Uniform Foreign Money-Judgments Recognition Act, like any other uniform act, must necessarily be limited in scope to those areas upon which there is likely to be a consensus of opinion and hence uniformity. The area of foreign support decrees is simply not an area which lends itself to uniformity of treatment — either in this country or abroad. As noted by Professor Homburger:

"Foreign support decrees have been the subject of several international efforts toward uniformity, all of which have treated them separately from money

> judgments. The widely divergent national laws relating to marital decrees of all kinds — as contrasted to other civil and commercial matters as to which there is a reasonable degree of similarity — are reason enough for separate treatment. Homburger, *supra* at 13.

Given the divergent state and foreign laws relating to marital decrees of all kinds (including, of course, alimony), uniformity simply could not be achieved if the scope of the Act were enlarged to encompass such decrees. Rather than abandon any hope of uniformity, the drafters of the Act limited its scope to those foreign money-judgments as to which there already existed a reasonable degree of similarity of treatment. Thus, the exclusion of judgments for support in matrimonial or family matters from the scope of the Act evidences *not* an intent that these judgments never be recognized, but rather a pragmatic approach to a difficult problem: that of drafting a statute which is likely to be adopted, without substantial modification, in a large number of jurisdictions.

There appears to be only one reported decision dealing with the effect of the Uniform Foreign Money-Judgments Recognition Act on the question of the jurisdiction of a state court to enforce the support provisions of a foreign divorce decree. Appellee contends that this case, *Nardi v. Segal,* 90 Ill. App. 2d 432, 234 N.E.2d 805 (1967), stands for the proposition that the Act *prevents* a state court from exercising jurisdiction to enforce the support provisions of a foreign decree. In our view, *Nardi* holds only that the Act does not *confer* jurisdiction to enforce (either in equity or at law) the support provisions of foreign divorce decrees. 234 N.E.2d at 807-08. At any rate, as noted *infra,* we decline to follow *Nardi.*

In sum, we hold that the Uniform Foreign Money-Judgments Recognition Act (Md. Ann. Code, Cts. & J. Proc. Art., §§ 10-701 through 10-709 (1974)) neither provides for the recognition or enforcement of the alimony provisions of the English divorce decree, nor precludes such recognition or enforcement on a basis other than that set out in the Act.

While we have held that the Uniform Foreign Money-Judgments Recognition Act does not provide a basis for the recognition or enforcement of the alimony provisions of the English divorce decree, we think the decree (including the provisions dealing with alimony) *may be* entitled to recognition under general principles of comity. The rule is well stated in *Litvaitis v. Litvaitis,*[4] 162 Conn. 540, 295 A. 2d 519, 521-22 (1972) that:

"The full faith and credit clause of the constitution of the United States does not apply to a divorce obtained in a foreign country. Courts of the United States are not required by federal law to give full force and effect to a judgment granted in a foreign nation. Hilton v. Guyot, 159 U. S. 113, 16 S. Ct. 139, 40 L. Ed. 95; Rosenbaum v. Rosenbaum, 309 N. Y. 371, 130 N.E.2d 902; Caldwell v. Caldwell, 298 N. Y. 146, 81 N.E.2d 60; Christopher v. Christopher, 198 Ga. 361, 31 S.E.2d 818; 33 Fordham L. Rev. 449; 32 U. Chi. L. Rev. 802. On the other hand, judgments of courts of foreign countries are recognized in the United States because of the comity due to the courts and judgments of one nation from another. Such recognition is granted to foreign judgments with due regard to international duty and convenience, on the one hand, and to rights of citizens of the United States and others under the protection of its laws, on the other hand. This principle is frequently applied in divorce cases; a decree of divorce granted in one country by a court having jurisdiction to do so will be given full force and effect in another country by comity, not only as a decree determining status, but also with respect to an award of alimony and child support. The principle of comity, however, has several important exceptions and qualifications. A decree of divorce will not be recognized by comity where it was obtained by a procedure which denies

---

4. The actual holding in *Litvaitis* was that the lower court properly refused to recognize a Mexican divorce decree where the defendant was not a domiciliary of the Mexican state. 295 A. 2d at 522.

> due process of law in the real sense of the term, or was obtained by fraud, or where the divorce offends the public policy of the state in which recognition is sought, or where the foreign court lacked jurisdiction. 24 Am. Jur. 2d, Divorce and Separation, § 964."

*See also Hilton v. Guyot, supra* at 202; *Growe v. Growe,* 2 Mich. App. 25, 138 N.W.2d 537, 540 (1965); *Pawley v. Pawley,* 46 So. 2d 464 (Fla. 1950), *cert. denied,* 340 U. S. 866-67 (1950); *Bates v. Bates,* 53 Nev. 77, 292 P. 298 (1930), *rehearing denied,* 53 Nev. 77, 296 P. 1112 (1931); Restatement of the Law (Second), Conflicts § 98, comment c.; 3 W. Nelson, *Divorce and Annulment,* §§ 33.11 and 33.12 at 439-42 (1945); C. Peterson, *supra* at 248-59. *See generally,* J. Wigmore, *supra* at 8; Note, *Recognition of Foreign Divorce Decrees,* 32 U. Chi. L. Rev. 802 (1965); 27B C.J.S., Divorce §§ 329 and 373 at 790-91 and 863-66. Moreover, while the cases are legion which refuse to recognize a foreign decree when it is shown that the foreign court lacked jurisdiction; that the foreign proceedings violated due process of law; or that, for some other reason, the decree offends the public policy of the state in which recognition is sought, *see e.g. Litvaitis v. Litvaitis, supra; Butler v. Butler,* 239 A. 2d 616 (D.C. App. 1968); *Tonti v. Chadwick,* 1 N. J. 531, 64 A. 2d 436 (1949); *and see* Annot., *Divorce — Decree of Foreign Country,* 13 A.L.R. 3d 1419 and cases cited therein, a foreign decree is presumed valid until some evidence to the contrary is presented. 3 W. Nelson, *supra* at 442-43.

Applying these principles to the case at bar, it is clear that the 1976 divorce decree (including the alimony provisions contained therein) was subject to recognition by the Circuit Court for Montgomery County under principles of comity. Having found that the decree was subject to recognition by the circuit court, we turn next to the question of whether the court, sitting in equity, had jurisdiction to enforce the alimony provisions of that decree.

In *McCabe v. McCabe,* 210 Md. 308, 318, 123 A. 2d 447 (1956), the Court of Appeals held that in Maryland, equity courts have jurisdiction to enforce a decree of another state,

both as to alimony accrued and to accrue, and may use for its enforcement the same equitable remedies and sanctions it could use to enforce a decree it had duly entered in the first instance. We think the rationale of *McCabe* equally applicable to foreign country decrees, and hold that in Maryland, equity courts have jurisdiction to enforce the alimony provisions of a foreign country decree which is subject to recognition in this State.

The decision in *McCabe* was bottomed upon the holding of the United States Supreme Court in *Barber v. Barber,* 62 U. S. 582 (1858) that the United States District Court for the District of Wisconsin, sitting in equity, had jurisdiction to enforce the alimony provisions of a New York decree. The court in *Barber* made one point crystal clear at the outset:

> "Our first remark is — and we wish it to be remembered — that this is not a suit asking the court for the allowance of alimony. That has been done by a court of competent jurisdiction. The court in Wisconsin was asked to interfere to prevent that decree from being defeated by fraud." *Id.* at 584.

The Court in *Barber* went on to hold that in England, courts of equity would enforce the alimony provisions of decrees of the ecclesiastical courts, and that the reason for the exercise of equity jurisdiction in such cases was equally applicable to courts of equity in the United States:

> "There is, too, another ground of jurisdiction in equity, just as certainly established as that is of which we have just spoken. It comprehends the case before us. It is, that courts of equity will interfere to compel the payment of alimony which has been decreed to a wife by the ecclesiastical court in England. Such a jurisdiction is ancient there, and the principal reason for its exercise is equally applicable to the courts of equity in the United States. It is, that when a court of competent jurisdiction over the subject-matter and the parties decrees a divorce, and alimony to the wife as its incident, and is unable of itself to enforce the decree summarily upon the

husband, that courts of equity will interfere to prevent the decree from being defeated by fraud." *Id.* at 590-91.

\* \* \*

"We have already shown, by many authorities, that courts of equity have a jurisdiction to interfere to enforce a decree for alimony, and by cases decided by this court; that the jurisdiction of the courts of equity of the United States is the same as that of England, whence it is derived. On that score, alone, the jurisdiction of the court in the case before us cannot be successfully denied." *Id.* at 592.

*See also McCabe v. McCabe, supra* at 312-13.

Having determined from *Barber* that the equity courts of this State have jurisdiction [5] to enforce the alimony provisions of a decree of another court of competent jurisdiction, the Court of Appeals in *McCabe,* based on principles of comity, *see McCabe v. McCabe, supra* at 316, held that it would permit the use of such equitable jurisdiction to enforce the alimony provisions of sister-state divorce decrees. *Id.* at 318.

In our view, the same principles of comity which produced the result in *McCabe* are equally applicable to decrees of foreign nations which are subject to recognition in this State. In *McCabe,* of course, the sister-state decree was entitled (absent a showing of lack of jurisdiction) to recognition under the Full Faith and Credit Clause of the United States Constitution, *see Williams v. North Carolina,* 325 U. S. 226 (1945), whereas foreign country decrees are not. But once it is determined under principles of comity that a foreign country decree will be recognized in this State, the question of enforcement becomes identical to that presented in *McCabe:* should the equity courts of this State compel obedience to a valid decree of a court of competent jurisdiction? We think the answer is yes. To recognize a

5. Md. Ann. Code, Cts. & J. Proc. Art., § 1-501 (1974) vests the circuit courts of this state with "full common law and equity powers and jurisdiction".

foreign country decree as valid, but then to leave a litigant without a remedy for the enforcement of such a decree would, in our view, render comity a rather meaningless concept.

In his brief, appellee attempts to demonstrate the inapplicability of *McCabe* to the instant case by noting that the *McCabe* Court emphasized that the Full Faith and Credit Clause of the United States Constitution, the Uniform Reciprocal Enforcement of Support Act and the Maryland Constitution all supported the result reached therein. While it is true that the *McCabe* Court relied on the Full Faith and Credit Clause, that clause was relied on *only* to establish that the Maryland courts *must* recognize (but not, necessarily, enforce) sister-state decrees. As previously noted, the decree in the case *sub-judice* was subject to recognition under the doctrine of comity. That the Court in *McCabe* was not relying on the Full Faith and Credit Clause as a basis for *enforcement* is made clear by its statement that:

> "The general view of these courts [allowing equitable enforcement of sister-state decrees] is that the requirements of the Full Faith and Credit Clause are a minimum, not a maximum, a command to do so much and not a prohibition against doing more, and that the enforcing state may give recognition and effect to decrees of a sister-state above and beyond that required by the Constitution of the United States, particularly as to the matter of remedies." *Id.* at 313.

The Court went on to note that ". . . states offering local equitable enforcement as to future payments do so on the ground of comity or the public policy of the state." *Id.* at 316.

Similarly, the *McCabe* Court's reliance on the Maryland Constitution does not render that case inapposite. The Court merely noted that, "Since the 1950 amendment of Art. III, Sec. 38, Constitution of Maryland, and the decision in *Zouck v. Zouck,* 204 Md. 285, obligation of support of minor children under a decree would, like alimony, be considered *a duty, not a debt." Id.* at 314. (Emphasis supplied). Thus, the *McCabe* Court found inapposite cases denying equitable relief on the

ground that accrued alimony is but a debt and, as such, is entitled to be collected only in the way any other debt is collected. *Id.* at 313. *See generally* Annot., *Foreign Alimony Decree-Enforcement,* 18 A.L.R. 2d 862. The fact that Maryland considers the obligation to pay alimony a duty, resting upon sound public policy, and not merely a debt collectible in an action at law, supports, we think, our holding that equity courts have jurisdiction to enforce the alimony provisions of foreign country decrees when such decrees are subject to recognition in this State.

Our enforcement of the alimony provisions of foreign country decrees will render more likely foreign country enforcement of the alimony provisions of decrees of the courts of this State. This, in turn, will render less likely incidents where Maryland spouses, unable to enforce the alimony provisions of Maryland decrees abroad, are dependent upon public assistance for support. Thus, as the State of Maryland clearly has a legitimate interest in the enforcement of the alimony provisions of foreign country decrees where such decrees are subject to recognition in this State, our holding that equity courts have jurisdiction to compel obedience to such decrees is supported by sound public policy.

We note next that while the *McCabe* Court mentioned the Uniform Reciprocal Enforcement of Support Act, *see* Md. Ann. Code, Art. 89C, the decision was in no way dependent upon the application of that Act. In reference to the Act, the Court merely stated that, ". . . *if* she [the wife] were residing in another state and proceeding under the Uniform Reciprocal Enforcement of Support Act against her husband who was in this State, the husband could be made to obey orders to support by sanctions available to equity." *Id.* at 315 (Emphasis supplied). The Court went on to state that it saw no reason why the same sanctions may not be made available to compel the husband to obey the decree of another state. *Id.* The *McCabe* Court mentioned the Uniform Reciprocal Enforcement of Support Act *not* as a jurisdictional basis for the equitable enforcement of sister-state alimony decrees, but rather to show a public policy in favor of the use of equitable

remedies to compel obedience to decrees for support. As previously noted, such a public policy clearly supports our holding in the case at bar.

Appellee contends that we should follow *Nardi v. Segal, supra,* holding that the lower court lacked jurisdiction to enforce a judgment of a foreign country [Israel] decree for child support. The court in *Nardi* followed a statement in *Clubb v. Clubb,* 402 Ill. 390, 84 N.E.2d 366, 371 (1949), that "jurisdiction of courts of equity to determine divorce cases and all matters relating thereto is conferred only by statute", and, finding no Illinois statute providing for the recognition or enforcement of the Israel decree,[6] held that the lower court had no jurisdiction to enforce it.

We decline to follow *Nardi* or any of the other progeny of *Clubb v. Clubb, supra.* The decision in *Clubb* has been criticized on the ground that while divorce proceedings in Illinois are purely statutory, "all matters relating thereto" are not. Note, *Domestic Relations — Denial of Equitable Enforcement of Foreign Alimony Decree,* 1 De Paul L. Rev. 147, 148-49 (1951). We agree with this criticism, and think the court in *Clubb* (and hence *Nardi*) failed to keep in mind the admonition of the Supreme Court in *Barber v. Barber, supra* at 584, that an action for the enforcement of the alimony provisions of a foreign decree is *not* an action for divorce or alimony: that has already been decided by a court of competent jurisdiction. *See McCabe v. McCabe, supra* at 312. It is simply an action to enforce a foreign decree. The fact that the decree happens to deal with matters relating to divorce is of no consequence. That equitable jurisdiction in all matters which may *relate* to divorce is *not* purely statutory in Maryland is made clear by the Court of Appeals holding in *McCabe v. McCabe, supra.*[7]

---

**6.** The court in *Nardi* noted that the Uniform Foreign Money-Judgments Recognition Act specifically excludes enforcement of a judgment for support of a foreign country in matrimonial or family matters. 234 N.E.2d at 808.

**7.** Maryland, of course, has no statute conferring specific authority on the equity courts of this State to enforce the alimony provisions of sister-state decrees. Nevertheless, the Court of Appeals in *McCabe* held that equity courts have such authority. *Compare* Tailby v. Tailby, 342 Ill. App. 664, 97 N.E.2d 611, 615 (1951) with McCabe v. McCabe, *supra. But see* Roberts v. Roberts, 11 Ill. App. 2d 86, 136 N.E.2d 590, 593 (1956) criticizing the holding in *Tailby.*

We conclude as we began: by emphasizing that we hold *only* that the Circuit Court for Montgomery County erred in sustaining appellee's preliminary objection on grounds of lack of personal and subject matter jurisdiction. We think courts of equity have jurisdiction to enforce the alimony provisions of foreign country decrees which are subject to recognition in this State. That is *not* to say that the decree in the case *sub judice* should be accorded such recognition. Appellee is certainly free to show (if he can) the illegality of the English decree. But we think the circuit court has jurisdiction to determine whether the English decree (including the alimony provisions contained therein) will be recognized as valid in this State, and, if it determines that the decree shall be accorded such recognition, to use equitable remedies to compel obedience to the terms of the decree.

> *Judgment reversed; case remanded for further proceedings not inconsistent with this opinion.*
> *Costs to be paid by appellee.*