947 A.2d 489

**Irfan ALEEM**

v.

**Farah ALEEM.**

**No. 108, Sept. Term, 2007.**

Court of Appeals of Maryland.

May 6, 2008.

Priya R. Aiyar (Michael K. Kellogg, Steven F. Benz, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC), on brief, for petitioner.

Susan M. Friedman (Daniel F. Cardine, Kuder, Smollar & Friedman, P.C., Washington, DC), on brief, for respondent.

Argued before BELL, C.J.,* RAKER, HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE, (retired, specially assigned), and DALE R. CATHELL, (retired, specially assigned), JJ.

CATHELL, J.

Farah Aleem filed suit for a limited divorce from her husband, Irfan Aleem in the Circuit Court for Montgomery County. The husband thereafter filed an Answer and Counterclaim. He raised no jurisdictional objections. Without, however, any advance notification to the wife, and while the Montgomery County action was pending (between the filing of the action for a limited divorce and the filing of the amended complaint for an absolute divorce), the husband, a Muslim and a national of Pakistan, went to the Pakistan Embassy in Washington, D.C., and performed *talaq*[1] by executing a written document that stated:

---

\* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

1. Apparently, under Islamic law, where that Islamic law has been adopted as the secular law of a jurisdiction, such as Pakistan, a husband has a virtual automatic right to *talaq,* (i.e., to divorce his wife by acknowledging "I divorce thee" three times) but the wife only has a right to *talaq* if it is in the written marriage agreement or if he otherwise delegates that right to her. In the present case the husband did not grant the wife the right to *talaq.* While the nature of *talaq* is relevant to the issues here presented, the wife does not claim that the husband "granted" her that right and accordingly that is not a factual issue in this case.

 Our holding in this case only relates to instances where Islamic law, or parts thereof such as *talaq,* is also the secular (civil) law of a country whose judgments we are urged to accept under the doctrine of comity.

"Now this deed witnesses that I the said Irfan Aleem, do hereby divorce Farah Aleem, daughter of Mahmood Mirza, by pronouncing upon her Divorce/Talaq three times irrevocably and by severing all connections of husband and wife with her forever and for good.

"1. I Divorce thee Farah Aleem

"2. I Divorce thee Farah Aleem

"3. I Divorce thee Farah Aleem . . . . "

Petitioner posits that the performance by him of *talaq* under Islamic religious and secular Pakistan law, and the existence of a "marriage contract," deprived the Circuit Court for Montgomery County of jurisdiction to litigate the division of the parties' marital property situate in this country.[2] The trial court found that the marriage contract entered into on the day of the parties' marriage in Pakistan specifically did not provide for the division of marital property and thus, for that reason alone, the agreement did not prohibit the Circuit Court for Montgomery County from dividing the parties' marital property under Maryland law. The Court of Special Appeals agreed and stated "[t]hus, the Pakistani marriage contract in the instant matter is not to be equated with a premarital or post-marital agreement that validly relinquished, under Maryland law, rights in marital property." *Aleem v. Aleem,* 175 Md.App. 663, 681, 931 A.2d 1123, 1134 (2007). The Court of Special Appeals further stated:

"If the Pakistani marriage contract is silent, Pakistani law does not recognize marital property. If a premarital or post-marital agreement in Maryland is silent with respect to marital property, those rights are recognized by Maryland law . . . . In other words, the 'default' under Pakistani law is

In other words, we address Islamic law only to the extent it is also the civil law of a country. The viability of Islamic law as a religious canon is not intended to be affected.

**2.** The "marital property" as it would be defined under Maryland law included the husband's pension from World Bank valued at approximately one million dollars, real property valued at $850,000, personal property valued at approximately $80,000, and two or more vehicles.

that Wife has no rights to property titled in Husband's name, while the 'default' under Maryland law is that the wife has marital property rights in property titled in the husband's name. We hold that this conflict is so substantial that applying Pakistani law in the instant matter would be contrary to Maryland public policy."

*Id.* at 681, 931 A.2d at 1134.

Petitioner presents two questions [3] for our review:

"1. [Did] the Court of Special Appeals disregard[ ] fundamental principles of international comity and conflicts of laws in refusing to recognize a Pakistani divorce because Pakistan and Maryland employ different 'default rules' for the division of property between spouses[?]"

"2. [Did] the Court of Special Appeals disregard[ ] fundamental principles of international comity and conflicts of laws in concluding that Pakistan lacked jurisdiction to dissolve the parties' marriage because the parties resided in Maryland on diplomatic visas[?]"

## The Relevant Facts

The parties, both citizens of Pakistan, were married in Pakistan in 1980. The marriage was arranged by the families of the parties. In accordance with Pakistani custom there was a written agreement presented to the wife on the day of the wedding for her to sign. At that time she was 18 years old and her husband was 29 years old. She had just graduated from high school and he was a doctoral candidate at Oxford University in England. The agreement provided as follows:

---

**3.** These questions raise broader issues than questions limited to the Pakistani marriage contract.

**"TRUE TRANSLATION"**

(URDU TO ENGLISH)

FORM NO. 2.

(See Rules : 8 & 10)
Under Rules : 8 & 10 of Muslim Family Laws
Ordinance, 1961 (VIII of 1961)

FORM

MARRIAGE CERTIFICATE / CONTRACT

1. Name of the Ward . Saddar Town/Union : 73 Tehsil/ **ATTESTED**

 Police Station : Saddar and District Karachi Where the marriage took place

2. Name of the bridegroom & His father, with IRFAN ALEEM S/o DR. ABDUL ALEEM QURESHI,
 their respective residence : 3-B, South Circular Avenue, Defence Soceity, Karachi.
3. Age of the Bridegroom : 29 years.

4. Name of the Bride & her father, with their FARAH MIRZA D/o MEHMOOD MIRZA,
 respective residence : A-100, Unit-3, Latifabad, Hyderabad.
 Not previously married
5. Whether the Bride is Virgin a Widow or a
 Divorced Wife : VIRGIN

6. Age of the Bride : 18 years.

7. Name of the Vakil, if any, appointed by the MUHAMMAD SULTAN MIRZA S/o MUHAMMAD AHMED MIRZA
 Bride, his father's name and his residence : D-20, P.E.C.H.S., Karachi.

8. Names of the Witnesses to the appointment 1) MUJAHID FAROOQI S/o MAZAHARUDDIN FAROOQI
 of Bride's Vakil, with their father's name, B-20, Gizri Boulevard, Karachi.
 their residence and the relationship with the 2) ZUBATR HASAN RIZVI S/o NAWAB ABDUL QASIM
 Bride. RIZVI, R-78, Block-5, F.B. Area, Mansoora, Karachi.

9. Name of the Vakil, if any, appointed by the
 Bridegroom, his father's name and his / / /
 residence :

10. Names of the Witness to the appointment
 of the Bridegroom's Vakil with their father's / / /
 names and their residence .

11. Names of the Witnesses to the Marriage, 1) BASHIR AHMED S/o S.M. IBRAHIM, 21 Khayaban-
 their father's names and their residence : e-Mujahid, Defence Society, Karahi.
 2) ABDUR RAZZAQ DEWAN S/o DAWOOD, No.6, Jinnah
 Society, Shaheed-e-Millat Road, Karachi.

12 Date on which the marriage was solemnized : July 16, 1980

13. Amount of Dower : Rs.51,000/-(Rupees Fifty One Thousand only)
14. How much of the Dower is Mu'ajjal (Prompt)
 and how much Mu'wajjal (Deferred) : Deferred

15. Whether any portion of the dower was paid
 at the time of marriage, if so, how much: / / /

16. Whether any property was given in lieu of the
 whole or any part of the dower, with
 specification of the same and its valuation / / /
 agreed to between the parties :

17. Special conditions, if any : / / / [This area contains
 Seals and Stamps]

18. Whether the husband had delegated the power / / /
 of divorce to the Wife, if so under what
 conditions :

19. Whether the husband's right of divorce in any
 way curtailed : / / [partially obscured by seal]

20. Whether any documents was drawn up at the
 time of marriage relating to dower and
 Maintenance, etc., if so contents thereof : [obscured by seal]

21. Whether the bridegroom has any existing wife,
 and if so, whether he has secured the /[partially obscured by seal]
 Permission of Arbitration Council under the
 Muslim Family Ordinance, 1961 to contract
 another Marriage :

22. Number and date of the Communications
 conveying to the Bridegroom the permission / / /
 of the Arbitration Council to contract another
 marriage :

23. Name, father's name and address of the person
 by whom the marriage was solemnized : SHAMSUL HASAN, Khateeb Masjid-e-
 Khizra, Saddar, Karachi.

24. Date of Registration of Marriage : July 19, 1980

25. Registration Fee Paid : Paid."

## That agreement provided for a "dower" of 51,000 rupees [5]

---

4. The spelling in this quote is exactly as it appears in the document.

5. While the dower was deferred at the time of the contract, it appears
 that when Irfan Aleem attempted to divorce Farah Aleem, that a sum of
 $2,500 was mentioned as a "full and final" settlement. Under Islamic
 law as it is in the civil law of Pakistan, a man, upon marriage, can defer
 the payment of the "dower" (*mahr* in Urdu) but he cannot divorce the
 wife by *talaq* unless he then pays the *mahr* to the wife. In a pleading
 filed in the Circuit Court for Montgomery County by the husband,
 *mahr*, is explained as follows:

 "Professor Esposito explains the function of dower *(mahr)* in a
 Muslim marriage. Dower can be used as a means of controlling the
 husband's power of divorce, since upon dissolution of the marriage
 he is requi[r]ed to pay the total amount of the dower at once. He
 goes on to state that the wife's claim for any unpaid portion of her

the payment of which was "deferred." There was no other express or implied waiver of any property rights of either party. During the presentation of the agreement, the wife was advised by her uncle who was acting as a "vakil." There is no evidence in this case, however, that the wife's uncle was a lawyer.[6] Under Pakistani law, unless the agreement provides otherwise, upon divorce all property owned by the husband on the date of the divorce remains his property and "the wife has [no] claim thereto." The opposite is also applicable. The husband has no claim on the property of the wife. In other words, upon the dissolution of the marriage, the property follows the possessor of its title.

Shortly after their marriage, the husband moved to England. The wife joined him later and they resided there for four years while he completed his studies. They then moved to the United States and began to reside in Maryland while the husband worked at the World Bank. They maintained a residence in this State for 20 years and resided here at the time the wife filed for divorce and the husband went to the Pakistan Embassy and performed *talaq*. The parties have two children, both of whom were born in this country, are United States citizens, and reside in this country. The wife is now a resident of Maryland, and holds a green card status.

The central issue in the present case concerns the wife's attempt to have the husband's pension from the World Bank, which relates primarily to his work performed while he was a

---

dower is an unsecured debt which is due from her husband.... Dower is a major part of the husband's financial commitment to his wife."

In the present case, the sum of $2,500 represents payment of the *mahr* to the wife. It is the husband's position that payment of *mahr* of $2,500 is all that is due the wife, as opposed to the one half of almost two million dollars that she might be entitled to under Maryland law (It is unclear how the *mahr* would affect the position of the Pakistani courts in respect to properties titled in both names. The primary property focus in the present case is the petitioner's pension—which is titled only in the husband's name.). This stark discrepancy highlights the difference in the public policies of this State and the public policies of Islamic law, in the form adopted as the civil, secular law of countries such as Pakistan.

**6.** Apparently, under Pakistani law a "vakil" performs the function of a legal advisor and often is a lawyer.

resident of this country, declared to be "marital property" and to have other property declared marital property and thus be entitled to half of that pension and property under Maryland law.[7]

## Discussion

■ More than a hundred years ago, the Supreme Court of the United States, in an extensive discussion relating to the judgments of foreign countries, discussed the comity due judgments of foreign countries and full faith and credit issues. We include a comprehensive discussion from that opinion, in order to place the issue in historical context. In *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), the Supreme Court of the United States opined, as follows:

"International law, in its widest and most comprehensive sense,—including not only questions of right between nations, governed by what has been appropriately called the 'law of nations,' but also questions arising under what is usually called 'private international law,' or the 'conflict of laws,' and concerning the rights of persons within the territory and dominion of one nation, by reason of acts, private or public, done within the dominions of another nation,—is part of our law, and must be ascertained and administered by the courts of justice as often as such questions are presented in litigation between man and man, duly submitted to their determination.

"The most certain guide, no doubt, for the decision of such questions is a treaty or statute of this country. But when, as is the case here, there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is, whenever it becomes necessary to do so, in order to determine the rights of parties to suits regularly brought before them. In doing this, the courts must obtain such aid as they can from

---

**7.** Due to the requirements of the World Bank's pension program, claims for a division of pension benefits based upon "marital property" status, are to be couched in terms of "alimony." The requirements of the World Bank in that regard are not crucial to our decision.

judicial decisions, from the works of jurists and commentators, and from the acts and usages of civilized nations.

"No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call 'the comity of nations.' Although the phrase has been often criticized, no satisfactory substitute has been suggested.

" 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, *or of other persons who are under the protection of its laws.*

. . .

"A judgment affecting the status of persons, such as a decree confirming or dissolving a marriage, is recognized as valid in every country, *unless contrary to the policy of its own law.*

. . .

"The law upon this subject as understood in the United States at the time of their separation from the mother country was clearly set forth by Chief Justice Parsons, speaking for the supreme judicial court of Massachusetts, in 1813, and by Mr. Justice Story in his Commentaries on the Constitution of the United States, published in 1833. Both those eminent jurists declared by the law of England the general rule was that foreign judgments were only prima facie evidence of the matter which they purported to decide; and that by the common law, before the American Revolution, all the courts of the several colonies and states were

deemed foreign to each other, and consequently judgments rendered by any one of them were considered as foreign judgments, and their merits re-examinable in another colony, not only as to the jurisdiction of the court which pronounced them, but also as to the merits of the controversy, to the extent to which they were understood to be re-examinable in England....

"It was because of that condition of the law, as between the American colonies and states, that the United States, at the very beginning of their existence as a nation, ordained that full faith and credit should be given to the judgments of one of the states of the Union in the courts of another of those states.

"By the articles of confederation of 1777 (article 4, § 3), 'full faith and credit shall be given, in each of these states, to the records, acts and judicial proceedings of the courts and magistrates of every other state.' By the constitution of the United States (article 4, § 1), full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state....

. . .

"The decisions of this court have clearly recognized that judgments of a foreign [country] are prima facie evidence *only,* and that, but for these constitutional and legislative provisions, judgments of a state of the Union, when sued upon in another state, would have no greater effect.

. . .

"Chancellor Kent ... [said]: 'No sovereign is obliged to execute, within his dominion ... he is at liberty, in his courts of justice, to examine into the merits of such [foreign] judgment [for the effect to be given to foreign judgments is altogether a matter of comity, in cases where it is not regulated by treaty]....'

. . .

"The reasonable, if not the necessary, conclusion appears to us to be that judgments rendered in France, or in any other foreign country, by the laws of which our own judgments are reviewable upon the merits, are not entitled to full credit and conclusive effect when sued upon in this country, but are prima facie evidence only of the justice of the plaintiffs' claim." (Brackets in original.) (Citations omitted.) (Some emphasis added.)

*Hilton,* 159 U.S. at 123–28, 16 S.Ct. at 143–68.

In *Andes v. Versant Corp.,* 878 F.2d 147, 149 (4th Cir.1989), that court reiterated the lack of applicability of the Full Faith and Credit Clause of the Federal constitution to judgments from foreign countries, saying "The Full Faith and Credit Clause of Article IV § 1 of the Constitution of the United States does not apply to foreign judgments." The same federal court of appeals in *Jaffe v. Accredited Surety and Casualty Co., Inc.,* 294 F.3d 584 (4th Cir.2002), opined as follows:

"Ruth Jaffe's reliance on this argument seems to arise from her confusion as to what is at issue in her case. With respect to her claim, we must determine the enforceability of the prior Florida judgment refusing to enforce her Canadian default judgment, not the enforceability of the Canadian default judgment itself. Neither the full faith and credit statute, nor the Full Faith and Credit Clause of the Constitution, applies to judgments issued from foreign countries. Accordingly, while both federal and state courts in the United States must give 'full faith and credit' to any judgment of a state court empowered to enter the judgment, they need only recognize the judgment of a foreign court to the extent that this recognition comports with the principles of judicial comity.

"For this reason, a state can refuse as Florida did, to recognize a *foreign* judgment on the ground that it conflicts

with the public policy of that state." (Citations omitted.) (Emphasis in original.)

*Jaffe*, 294 F.3d at 591–92.

And *see, Taveras v. Taveraz,*[8] 477 F.3d 767, 781–83, (6th Cir.2007) ("However, it is well-settled that, unlike the recognition and enforcement of judgments due to sister states, a foreign country's judgments are not subject to the Full Faith and Credit Clause." (citations omitted).)

Much earlier, Maryland had formulated the same concepts in the cases of *Owings v. Nicholson,* 4 H. & J. 66 (1815),[9] which involved a judgment in the courts of Martinique, and in *Gardner v. Lewis,* 7 Gill 377 (1848), a case involving comity between states, but in which we relied on the law of comity between nations. In *Gardner* we stated as follows:

> "The comity of nations, we are told, (see *Story on Conflict of Laws, p.* 38,) 'is derived altogether from the voluntary consent of the latter,' (the State, within whose territory it is attempted to make the law of another State obligatory,) 'and it is inadmissible, when it is contrary to its known policy, or injurious to its interests;' and it is 'only in the silence of any positive rule, affirming, or denying, or restraining the operation of any foreign laws, the Courts of justice presume the tacit adoption of them, by their own government; unless they are repugnant to its policy or prejudicial to its interests.' This also, he assures us: 'A nation will not suffer its own subjects to evade the operation of its fundamental policy, or laws; or to commit fraud in violation of them, by any acts or contracts made with that design, in a foreign country; and it will judge for itself, how far it will adopt, and how far it will reject, any such acts or contracts.' "

*Gardner,* 7 Gill at 392.

In a case somewhat similar to the case at bar, the situs of property of a wife was in Maryland. Maryland had enacted a

---

**8.** The reported opinion contains the different spellings of the husband's name and wife's name throughout—without explanation.

**9.** The majority opinion in this case was never delivered to the reporters *and is not included in the bound volume.*

law (pursuant to a constitutional mandate) that provided that the property of a wife in Maryland was not liable for the debts of the husband. The wife and the husband moved to, and became domiciled in, Illinois. That state had no comparable law. An action was brought to attach the wife's property in Maryland for the debts of the husband on the ground that the law of the parties' domicile should control. We rejected that contention in *Smith v. McAtee*, 27 Md. 420 (1867), stating as follows:

"And although we find this right of the wife to her property, protected in this State, by public policy, by statute and by decree of a Court of Equity, yet it was earnestly contended by the learned counsel for the appellee, that a creditor of the husband had a right to attach this fund in our courts of justice for the debt of the husband, as by the laws of Illinois, where the husband and a wife resided, the husband was entitled to all the personal property of the wife, and that by virtue of this law of the domicil the fund was vested in the husband. And he claimed this right to divest the wife of her property by the law of the domicil, on the ground of comity. In this case we cannot sanction such a right, for it has been decided that comity is overruled by positive law, and that it is only in the silence of any particular rule, affirming, denying or restraining the operation of foreign laws, that courts of justice presume a tacit adoption of them by their own government. It is certainly competent for any State to adopt laws to protect its own property as well as to regulate it, and 'no State will suffer the laws of another to interfere with her own, and in the conflict of laws, when it must often be a matter of doubt, which shall prevail, the court which decides, will prefer the laws of its own country to that of the stranger.'... If therefore our legislative enactment in regard to the property of the wife and the laws of Illinois conflict, it cannot be made a question in our own courts which shall prevail. 'Where there is no constitutional barri-

er, we are bound to observe and enforce the statutory provisions of our own State.' " (Citations omitted.)

*Smith,* 27 Md. 420, 437–38.

▮ Shortly after the decision in *Hilton v. Guyot, supra,* we conformed to its principles in a case where the issue was whether the laws of Delaware or Maryland would control in respect to certain personal property. Albeit in reference to comity between states, we discussed it in *Lowndes v. Cooch,* 87 Md. 478, 39 A. 1045 (1898), as follows:

"The leading inquiry, therefore, which this appeal presents is, does the law of Delaware or the law of Maryland control the disposition of the bank stock in controversy here? ... 'It [personal property] follows the law of the person. If he dies, it is not the law of the country in which the property is, but the law of the country of which he was a subject, that will regulate the succession.' ...

"*This doctrine, however firmly established, is nevertheless subject to proper limitation to the effect that if a foreign law directly violates some recognized principle of public policy, or some established standard of morality prevailing in the forum exercising jurisdiction, the rules of comity will not compel such forum to enforce the foreign law rather than its own, if to do so would be hurtful or detrimental to the interest and welfare of its own citizens.*" (Emphasis added.)

*Lowndes,* 87 Md. at 485–87, 39 A. at 1046. We continued to recognize that emphasized doctrine in our cases (albeit sometimes in respect to comity issues between the various states of the United States instead of between Maryland and foreign countries. The doctrine, however, is the same in both instances). *See Castleman v. Templeman,* 87 Md. 546, 552, 40 A. 275, 277 (1898) ("[W]e can see no reason why the receiver should not be permitted to sue here ... but through comity ... when such suit does not injuriously affect the interests of the citizens of the latter, or violate its policy or laws."); *Northern Aluminum Co. v. Law,* 157 Md. 641, 646, 147 A. 715, 717 (1929) ("As to judgments of courts of foreign countries, there

is no constitutional requirement of recognition. It is a matter of comity.").

*Telnikoff v. Matusevitch,* 347 Md. 561, 702 A.2d 230 (1997) (a "certified question" case), is perhaps the most modern and seminal of our cases on comity between Maryland and foreign countries. It did not involve issues of marital property or other domestic law issues, but involved primarily the law of defamation and the constitutional guarantees of freedom of speech.[10] *Telnikoff,* however, did restate with clarity the issues that relate to comity and their application generally. As stated above, the case involved the difference between the laws of libel of England and of Maryland. An English citizen had obtained a judgment in the courts of England based upon a libel occurring in England. He sought to have the judgment enforced in this country and Matusevitch brought an action to preclude the enforcement. We stated as follows:

> "Telnikoff argues that the English libel judgment is entitled to recognition under principles of 'comity.' Matusevitch, on the other hand, asserts that the English judgment is repugnant to the public policy of the United States and Maryland and, therefore, should be denied recognition.

> "The recognition of foreign judgments is governed by principles of comity.

> . . .

> "( . . . 'Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to the international duty and convenience and to the rights of persons protected by its own laws'). . . .

> "Although foreign judgments are entitled to a degree of deference and respect under the doctrine of comity, courts will nonetheless deny recognition and enforcement to those

---

10. U.S. Const. amend. I.

foreign judgments which are inconsistent with the public policies of the forum state. . . .

"The justification for the public policy exception to the recognition of foreign judgments as articulated by the United States Court of Appeals for the District of Columbia Circuit in *Laker Airways v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C.Cir.1984), as follows:

'There are limitations to the application of comity. When the foreign act is inherently inconsistent with the policies underlying comity, domestic recognition could tend either to legitimize the aberration or to encourage retaliation, undercutting the realization of the goals served by comity. No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum. Thus, from the earliest times, authorities have recognized that the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act.'

. . .

"In determining non-constitutional principles of law, courts often rely upon the policies and requirements reflected in constitutional provisions. . . . ('Although [Article 46 of the Maryland Declaration of Rights] may not directly apply to private employers, it nonetheless establishes a public policy in Maryland that an individual should not be subjected to sex-based discrimination).' "

*Telnikoff*, 347 Md. at 573–80, 702 A.2d at 236–39.

The Court of Special Appeals, in *Wolff v. Wolff*, 40 Md.App. 168, 389 A.2d 413 (1978), noted as follows:

" 'The full faith and credit clause . . . does not apply to a divorce obtained in a foreign country. Courts of the United States are not required by federal law to give full force and effect to a judgment granted in a foreign nation. On the other hand, judgments of courts of foreign countries are recognized in the United States because of comity. . . . This principle is frequently applied i n divorce cases. . . . The

principle of comity, however, has several important exceptions and qualifications. A decree of divorce will not be recognized by comity where it was obtained by a procedure which denies due process of law in the real sense of the term, or was obtained by fraud, or where the divorce offends the public policy of the state in which recognition is sought. . . .' " (Citations omitted.)

*Wolff,* 40 Md.App. at 177–78, 389 A.2d at 418.[11]

 The Maryland Legislature declared Maryland's public policy in regard to property acquired during a marriage, stating in the preamble to Chapter 794 of the Acts of 1978, that "the property interests of the spouses should be adjusted fairly and equitably." And furthermore, from the record in the present case, it appears that under Islamic law, which, albeit with certain modifications, has been adopted as the law in Pakistan, only the husband has an independent right to *talaq, i.e.,* to use *talaq* to divorce his wife.[12] The wife may

---

11. We affirmed and adopted the opinion of the Court of Special Appeals in *Wolff, supra,* at *Wolff v. Wolff,* 285 Md. 185, 401 A.2d 479 (1979).

12. As stated by the Court of Special Appeals:
 "The Pakistani law of divorce was succinctly described by the House of Lords in *In re Fatima,* [1986] 2 W.L.R. 693, [1986] 2 All E.R. 32, [1986] A.C. 527, 1996 WL 406815(HL). There, the entire court joined in the opinion ('speech') of Lord Ackner, who said:
 In Pakistan the law relating to divorce is the Islamic law as modified by the Muslim Family Laws Ordinance 1961. In traditional Islamic law the husband has the right unilaterally to repudiate his wife, without showing cause and without recourse to a court of law. Such divorce is effected by the announcement of the formula of repudiation, a talaq, and in traditional law a divorce by talaq would take the simple form of the husband announcing talaq three times. The divorce then becomes immediately effective and irrevocable. Such a form of talaq has been called "a bare talaq." Although it is still effective in some countries, for example, Dubai, section 7 of the Ordinance provides:
 " '(1) Any man who wishes to divorce his wife shall, as soon as may be after the pronouncement of talaq in any form whatsoever, give the chairman notice in writing of his having done so, and shall supply a copy thereof to the wife. (2) Whoever contravenes the provisions of subsection (1) shall be punishable with simple imprisonment for a term which may extend to one year or with fine which may extend to 5,000 rupees or with both. (3) Save as provided in subsection (5), a

only utilize *talaq* if the husband has given her that right in the contract of marriage. In the case at bar, the wife was not granted the right of *talaq* by her husband. It appears, also from the record, that the husband may utilize *talaq* with no prior notice to the wife. It is clear as well, as we point out above, that, under Pakistani law, upon a divorce there is no equitable division of marital property, i.e., property acquired by the parties during the marriage, unless the marriage "contract" so provides.

On November 7, 1972, the people of Maryland ratified the Equal Rights Amendment, now found as Article 46 of the Maryland Declaration of Rights. It provides "Equality of rights under the law shall not be abridged or denied because of sex." Md. Const. Declaration of Rights, art. 46. Accordingly, in the first instance, the enforceability of a foreign *talaq* divorce provision, such as that presented here, in the courts of Maryland, where only the male, i.e., husband, has an independent right to utilize *talaq* and the wife may utilize it only with the husband's permission, is contrary to Maryland's constitu-

---

talaq unless revoked earlier, expressly or otherwise, shall not be effective until the expiration of 90 days from the day on which notice under subsection (1) is delivered to the chairman. (4) Within 30 days of the receipt of notice under subsection (1), the chairman shall constitute an arbitration council for the purpose of bringing about a reconciliation between the parties, and the arbitration council shall take all steps necessary to bring about such reconciliation. (5) If the wife be pregnant at the time talaq is pronounced talaq shall not be effective until the period mentioned in subsection (3) or the pregnancy, whichever be later, ends. (6) Nothing shall debar a wife whose marriage has been terminated by talaq effective under this section from remarrying the same husband, without an intervening marriage with a third person, unless such termination is for the third time so effective.'

" 'The chairman' refers to the chairman of the relevant local union council in Pakistan. Although he is required to convene an arbitration council to attempt the reconciliation of the parties, their attendance is not obligatory and the divorce will become effective, unless the wife is pregnant, once 90 days have elapsed from the date on which the chairman received notice of the talaq."

[1986] A.C. at 531–32."

*Aleem v. Aleem*, 175 Md.App. 663, 665–66, 931 A.2d 1123, 1124–25 (2007).

tional provisions [13] and thus is contrary to the "public policy" of Maryland. Moreover, if we were to recognize the use of *talaq*, controlled as it is by the husband, a wife, a resident of this State, would never be able to consummate a divorce action filed by her in which she seeks a division of marital property, because a husband who is a citizen of any country in which Islamic law, *adopted as the civil law*, prevails could go to the embassy of that country and perform *talaq*, and divorce her (without prior notice to her) long before she would have any opportunity to fully litigate, under Maryland law, the circumstances of the parties' dissolution of their marriage.[14]

*Talaq* lacks any significant "due process" for the wife, and its use moreover, directly deprives the wife of the "due process" she is entitled to when she initiates divorce litigation in this State. The lack and deprivation of due process is itself contrary to this State's public policy.

Petitioner directs the Court's attention to the practice in Pakistan of having a Council of Arbitration [15] available to the wife. That practice, however, only applies if the parties want to reconcile and it addresses only that possibility. In a situation where both parties seek divorce, as here, it has virtually no application. Its function was explained at the trial level by a letter from Muhammad Najeeb, Chairman of the Arbitration Council in the Clifton Cantonment, Karachi, Pakistan, to the attorney for the wife, as follows:

---

**13.** Article 46 of the Maryland Declaration of Rights, *supra.*

**14.** In a letter from respondent's counsel to the Arbitration Council, respondent points out that the husband's performance of *talaq* was designed to circumvent Maryland law. She stated in relevant part as follows:

"Mr. Aleem is obligated to provide Ms. Aleem with both child support and alimony pursuant to Order of Court. Mr. Aleem, by seeking a divorce in Pakistan, is attempting to circumvent the laws of the state of Maryland, and the Order of our Court, notwithstanding that he has submitted to the Court's jurisdiction, to this day has counsel here in Maryland, and has regularly sought our Court's relief."

**15.** It is referred to by different names in the record before this Court. We shall refer to it as the "Council of Arbitration."

"Please refer to your letter dated 15th Dec., 2003, on behalf of your client[ ] M st. Farah Aleem, I may inform you that the marriage was solemnized in Pakistan within the jurisdiction of this Union Council and that both your client and Mr. Aleem are Pakistani citizens and therefore this Union Council has jurisdiction in the matter. We had sent notices to your client as provided under Section 7 of the Muslim Family Laws Ordinance 1961. The purpose of notices is to ascertain whether both parties want to reconcile in which case the divorce shal[l] not become final. In case both parties or any one of them does not want reconciliation, the divorce shall become final after 90 days of such notice.... Mr. Aleem had responded in writing that he does not want to reconcile but there is no intimation from your client [in][ ]spite of the fact that your client has received the notice which will be presumed that she does not want any reconciliation. *It may also be mentioned that function of the Arbitration Council is **only** to see whether both husband and wife want to reconcile and live again as husband and wife.*" (Bolding added.) (Emphasis added.)

Additionally, as indicated above, Maryland has enacted a comprehensive statutory scheme designed to effectuate a fair division of property acquired by the parties during the time of their marriage, just as the pension at issue in this case was acquired.[16] To accept *talaq* and to accept the silence of the "contract" signed by the wife on the day of her marriage in Pakistan, as a waiver of her rights to marital property acquired during the marriage, is, in direct conflict with our public policy. Additionally, the Pakistani statutes proffered by petitioner as establishing that all of the property titled in his name, however and whenever acquired, is his property free of any claim by the wife arising out of the marriage, are also in direct conflict with the Maryland statutes [17] governing those same issues.

---

**16.** The *mahr*, deferred in the marriage certificate, would not normally be classified under Maryland law as marital property in any event, as it may not have been "acquired" during the marriage.

**17.** Md.Code (1984, 2006 Repl. Vol., 2007 Cum.Supp.) §§ 8–201, 8–202, 8–203, 8–204, 2–205 of the Family Law Article; Md.Code (1984, 2006

Judge Rodowsky, for the Court of Special Appeals, stated, as indicated earlier:

"If the Pakistani marriage contract is silent,[18] Pakistani law does not recognize marital property. If a premarital or post-marital agreement in Maryland is silent with respect to marital property, those rights are recognized by Maryland law.... In other words, the 'default' under Pakistani law is that Wife has no rights to property titled in Husband's name, while the 'default' under Maryland law is that the wife has marital property rights in property titled in the husband's name. We hold that this conflict is so substantial that applying Pakistani law in the instant matter would be contrary to Maryland public policy."

*Aleem*, 175 Md.App. at 681, 931 A.2d at 1134. We agree.

The *talaq* divorce of countries applying Islamic law, unless substantially modified, is contrary to the public policy of this state and we decline to give *talaq*, as it is presented in this case, any comity. The Pakistani statutes providing that property owned by the parties to a marriage, follows title upon the dissolution of the marriage unless there are agreements otherwise, conflicts with the laws of this State where, in the absence of valid agreements otherwise or in the absence of waiver, marital property is subject to fair and equitable division. Thus the Pakistani statutes are wholly in conflict with the public policy of this State as expressed in our statutes and we shall afford no comity to those Pakistani statutes.

Additionally, a procedure that permits a man (and him only unless he agrees otherwise) to evade a divorce action begun in this State by rushing to the embassy of a country recognizing *talaq* and, without prior notice to the wife, perform "I divorce thee ..." three times and thus summarily terminate the

---

Repl.Vol.) § 8–206 et seq. of the Family Law Article (describing property disposition in annulment and divorce).

**18.** The places in the "contract" where a division of property would normally appear were simply left blank in the case at bar.

marriage and deprive his wife of marital property, confers insufficient due process to his wife. Accordingly, for this additional reason the courts of Maryland shall not recognize the *talaq* divorce performed here.

We answer no to each of petitioner's questions.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY PETITIONER.**