40 A.3d 1051

### Peter Paul TOLAND, Jr.

v.

### Akiko FUTAGI.

### No. 83, Sept. Term, 2011.

Court of Appeals of Maryland.

March 28, 2012.

Stephen J. Cullen (Kelly A. Powers of Miles & Stockbridge P.C., Baltimore, MD), on brief, for Appellant.

Judy Dugger (Fairfax, VA; Thomas McCarthy, Sr., Annapolis, MD), on brief, for Appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BATTAGLIA, J.

This case involves the interpretation of the Uniform Child Custody Jurisdiction and Enforcement Act, Sections 9.5–101 to 9.5–318 of the Family Law Article, Maryland Code (1984, 2006 Repl.Vol.).[1]  Peter Paul Toland, Jr.,[2] Appellant, challenges the Circuit Court for Montgomery County's determination that a Japanese decree providing guardianship of his minor child to the child's grandmother, Akiko Futagi, Appellee, without notice to him, did not constitute a violation of his due process rights.  He also argues that the Circuit Court's dismissal of his Complaint to Establish Custody, pursuant to Uniform Child Custody Jurisdiction and Enforcement Act, was error.  On our own motion and prior to any proceedings in the Court of Special Appeals, we granted certiorari to consider the following questions:

---

1.  All statutory references to the Family Law Article are to the Maryland Code (1984, 2006 Repl.Vol.), unless stated otherwise.

2.  The Appellant is a member of the Navy, although he has been referred to in the parties' briefs as "Mr. Toland;" we shall continue with that appellation.

1. Whether the lower court erred and violated Mr. Toland's due process rights and fundamental liberty interest in the care, custody and control of his daughter in violation of the United States Constitution [3] and the Maryland Declaration of Rights.[4]

2. Whether the lower court erred and misapplied the UCCJEA when it granted the Appellee's Motion to Dismiss.

We shall hold that the Circuit Court's dismissal of Mr. Toland's complaint did not violate his due process rights under the United States Constitution and the Maryland Declaration of Rights, as they were not implicated by the Japanese decree. We also shall hold that the Circuit Court properly applied the Uniform Child Custody Jurisdiction and Enforcement Act to conclude that it should not exercise jurisdiction over Mr. Toland's Complaint to Establish Custody of his daughter, because the child had no connection with Maryland, and Japan, where she was born and has lived her entire life, had not declined custody jurisdiction. In so holding, we shall affirm the Circuit Court's dismissal of Mr. Toland's Complaint to Establish Custody.

**Introduction**

Whenever a child custody dispute in Maryland involves another state or another country, the Maryland Uniform Child Custody Jurisdiction and Enforcement Act is implicated. *In re Kaela C.*, 394 Md. 432, 454, 906 A.2d 915, 928 (2006). The Maryland Uniform Child Custody Jurisdiction and Enforcement Act, which is currently codified as Sections 9.5–101

---

**3.** The Due Process Clause of the Fourteenth Amendment to the Constitution of the United States provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."

**4.** Article 24 of the Maryland Declaration of Rights states:

Article 24. Due Process. "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privilege, or outlawed, or exiled, or in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

through 9.5–318 of the Family Law Article, was enacted in 2004 to replace its predecessor, the Maryland Uniform Child Custody Jurisdiction Act, which was initially enacted in 1975 and codified as Sections 184 to 207 of Article 16, Maryland Code (1957, 1966 Repl.Vol., 1977 Supp.) and was later repealed and recodified [5] as Sections 9.5–201 to 9.5–403 of the Family Law Article, Maryland Code (1984, 1985 Supp.).

By way of background, in 1968, the National Conference of Commissioners on Uniform State Laws [6] drafted the Uniform Child Custody Jurisdiction Act to address the problem of conflicting custody decrees among states and foreign countries and a "growing public concern over the fact that thousands of children are shifted from state to state and from one family to another every year while their parents or other persons battle over their custody in the courts of several states." Unif. Child Custody Jurisdiction Act, Prefatory Note, 9 U.L.A. Part IA, at 262 (1999); *see also In re Kaela C.*, 394 Md. at 454, 906 A.2d at 928 (The Uniform Child Custody Jurisdiction Act was designed to "address both the increased mobility of individuals and the negative results of that mobility, namely the rampant kidnaping of children by parents looking to relitigate custody determinations in a more favorable forum, a tactic known as 'seize and run.'"). The concern was that movement of a child from state to state, by parents or family members seeking a more favorable custody decree in another jurisdiction, created an instability that inhibited the child's ability to develop personal attachments or a sense of belonging in a community.

---

**5.** The 1984 recodification of the Maryland Uniform Child Custody Jurisdiction Act, as part of the Family Law Article, reflected only stylistic changes from the original version in the 1957 Maryland Annotated Code. *Olson v. Olson*, 64 Md.App. 154, 159 n. 1, 494 A.2d 737, 740 n. 1 (1985).

**6.** The National Conference of Commissioners on Uniform State Laws is composed of judges, practitioners and scholars from every state in the country, as well as the District of Columbia. Generally, four Commissioners represent each state and are appointed by the governor or the legislature. Promulgation of a Uniform Act, through a vote of states, constitutes the National Conference's recommendation for adoption in all states. Preface, 9 U.L.A. Part IA, at III–IV (1999).

Courts, including the Supreme Court of the United States, had yet to clarify whether the Full Faith and Credit Clause of the United States Constitution applied to custody determinations, which often led to "a custody decree made in one state one year [that] is often overturned in another jurisdiction the next year or some years later and the child is handed over to another family, to be repeated as long as the feud continues." 9 U.L.A. Part IA, at 263–64.

In order to determine which state had jurisdiction, the Uniform Child Custody Jurisdiction Act limited interstate custody jurisdiction to the child's "home state," where the child had lived for at least six months prior to the proceeding, or the state that had strong contacts with the child and family. Unif. Child Custody Jurisdiction Act, Section 3(a), 9 U.L.A. Part IA, at 307. Where a state was not the home state or of significant connection to the child, then only in instances of emergency, such as when the child was abandoned in the state, or when no other state had jurisdiction, would a state assume jurisdiction over an interstate child custody determination. *Id.* To further discourage competition among states, the Uniform Child Custody Jurisdiction Act also required that a court decline jurisdiction upon learning of an ongoing proceeding in another state, and permitted a court to decline jurisdiction upon determining that the petitioner had wrongfully taken the child from another state, or that the court was an inconvenient forum because, for example, another state had a closer connection with the child. *See* Unif. Child Custody Jurisdiction Act, Sections 6, 7, 8, 9 U.L.A. Part IA, at 474, 497–98, 526. The Act also required a court to maintain a registry of out of state custody decrees and to recognize and enforce decrees from other states and foreign countries. Unif. Child Custody Jurisdiction Act, Section 16, 9 U.L.A. Part IA, at 625–26. In effect, the Uniform Child Custody Jurisdiction Act required a court, upon learning of an interstate dimension of a child custody proceeding brought before it, to engage in a two-step inquiry: determine whether it had jurisdiction and, if so, whether it should exercise jurisdiction.

In 1997, the Commissioners revised the Uniform Child Custody Jurisdiction Act "in light of federal enactments and almost thirty years of inconsistent case law." Unif. Child Custody Jurisdiction & Enforcement Act, Prefatory Note, 9 U.L.A. Part IA, at 650. One of the federal enactments referred to was the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A,[7] which expressly provided that full faith and

---

7. The Parental Kidnapping Prevention Act, Section 1738A of Title 28, United States Code provides in pertinent part:

    (a) The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsections (f), (g), and (h) of this section, any custody determination or visitation determination made consistently with the provisions of this section by a court of another State.

*     *     *

    (c) A child custody or visitation determination made by a court of a State is consistent with the provisions of this section only if—

    (1) such court has jurisdiction under the law of such State; and

    (2) one of the following conditions is met:

      (A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;

      (B) (i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

      (C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because the child, a sibling, or parent of the child has been subjected to or threatened with mistreatment or abuse;

      (D) (i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody or visitation of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or

      (E) the court has continuing jurisdiction pursuant to subsection (d) of this section.

    (d) The jurisdiction of a court of a State which has made a child custody or visitation determination consistently with the provisions of

credit must be given to child custody determinations. The Parental Kidnapping Prevention Act conflicted with the Uniform Child Custody Jurisdiction Act in part because the latter provided that both the home state of the child and the state having significant connections with the child and family could exercise jurisdiction, whereas the Parental Kidnapping Prevention Act gave exclusive jurisdiction to the home state, so as to avoid concurrent jurisdiction with another state. *See* Section 1738A(c)(2)(A) of Title 28, United States Code.

The Maryland Uniform Child Custody Jurisdiction Act was enacted in 1975, in order to

> help eliminate jurisdictional competition and conflict with courts of other States, discourage continuing controversies over child custody, avoid re-litigation of custody decisions of other States, and promote and expand the exchange of information and other forms of mutual assistance between the courts of this State and those of other States concerned with the same child.

Legislative Council of Maryland, Report to the General Assembly of 1975: Proposed Bills 174–75 (1975). The Maryland Child Custody Jurisdiction and Enforcement Act was enacted in 2004 and repealed the Maryland Uniform Child Custody Jurisdiction Act at the same time; the purpose of the new Act remained the elimination of competition among states in determining interstate child custody disputes. *See Garg v. Garg,* 393 Md. 225, 239, 900 A.2d 739, 747 (2006) ("Jurisdiction or its exercise under both the UCCJA and UCCJEA is a threshold legal issue that the law requires be resolved expeditiously."); *see also* Unif. Child Custody Jurisdiction & Enforcement Act, Section 101 cmt., 9 U.L.A. Part IA, at 657.

The Maryland Uniform Child Custody Jurisdiction and Enforcement Act, codified in Section 9.5–201(a) of the Family Law Article, prescribes that a Circuit Court in this State has

---

this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

jurisdiction to entertain a child custody complaint if Maryland is the home state of the child:

(a) *Grounds for jurisdiction.*—Except as otherwise provided in § 9.5–204 of this subtitle, a court of this State has jurisdiction to make an initial child custody determination only if:

(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State;

(2) a court of another state does not have jurisdiction under item (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under § 9.5–207 or § 9.5–208 of this subtitle, and:

(i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and

(ii) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under item (1) or (2) of this subsection have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under § 9.5–207 or § 9.5–208 of this subtitle; or

(4) no court of any other state would have jurisdiction under the criteria specified in item (1), (2), or (3) of this subsection.

Section 9.5–201(a) of the Family Law Article. The Act also provides that a Circuit Court may decline to exercise jurisdiction if it determines that it is an inconvenient forum, pursuant to Section 9.5–207 of the Family Law Article, or that "a person seeking to invoke its jurisdiction has engaged in unjustifiable

conduct," under Section 9.5–208 of the Family Law Article. It also contains a catch-all "vacuum jurisdiction" provision, Section 9.5–201(a)(4) of the Family Law Article, which allows a court in this State to exercise jurisdiction where no other state, including a foreign country, can.[8]

In the present case, Maryland is not the home state of Mr. Toland's child, while Japan is. At issue is the international application of the Maryland Uniform Child Custody Jurisdiction and Enforcement Act, which is discussed in Section 9.5–104 of the Family Law Article:

(a) *Foreign country treated as state.*—A court of this State shall treat a foreign country as if it were a state of the United States for the purpose of applying Subtitles 1 and 2 of this title.

(b) *Recognition and enforcement of child custody determination made by foreign country.*—Except as otherwise provided in subsection (c) of this section, a child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of this title must be recognized and enforced under Subtitle 3 of this title.

(c) *Applicability of title.*—A court of this State need not apply this title if the child custody law of a foreign country violates fundamental principles of human rights.

Section 9.5–104 of the Family Law Article. Subsection (c) contains the language upon which Mr. Toland relies to assert that a Maryland circuit court can exercise jurisdiction over his child in Japan. That section provides that a Maryland court need not apply the Maryland Uniform Child Custody Jurisdiction and Enforcement Act in a situation in which the child

---

8. "Vacuum jurisdiction" is the phrase coined to refer to that section of the original Uniform Child Custody Jurisdiction Act and later the Uniform Child Custody Jurisdiction and Enforcement Act that enables jurisdiction as a matter of last resort because no other state exercises jurisdiction as the child's home state, as the "more appropriate forum" based on significant connections to the child and family, or had declined to exercise jurisdiction. Unif. Child Custody Jurisdiction Act, Section 3 note 102, 9 U.L.A. Part IA, at 422 (1999).

custody laws of a foreign country "violate[ ] fundamental principles of human rights." Section 9.5–104(c) of the Family Law Article. Although the term "fundamental principles of human rights" was left undefined in the Act proposed by the Commissioners, as well as in the Maryland statute, the drafters alluded to a similar provision in the Hague Convention on the Civil Aspects of Child Abduction, which permits a country to refuse to return a child if the return would violate "the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," which has been interpreted by the United States Department of State as "utterly shock[ing] the conscience or offend[ing] all notions of due process." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. 10,494, 10,510 (1986); *see also* Unif. Child Custody Jurisdiction & Enforcement Act, Section 105 cmt., 9 U.L.A. Part IA, at 662.

**Factual and Procedural Background**

Mr. Toland filed a Complaint To Establish Custody in the Circuit Court for Montgomery County, alleging that he was entitled under Section 5–203(a) of the Family Law Article, Maryland Code (1984, 2006 Repl.Vol.),[9] as the sole surviving parent, to custody of his nine-year-old daughter, Erika,[10] who presently lives with her maternal grandmother, Akiko Futagi in Japan, after having lived in Japan since her birth. Etsuko, Mr. Toland's ex-wife and the mother of the child, had previously been awarded custody by a Japanese Court. Etsuko died in 2007, and a Japanese decree issued thereafter, and without notice to Mr. Toland, appointed Ms. Futagi, the grandmother, as the guardian of Erika. Upon learning of the guardianship decree, Mr. Toland amended his complaint and alleged that Maryland was the appropriate forum to determine

---

9. Section 5–203(a)(2)(i) of the Family Law Article, Maryland Code (1984, 2006 Repl.Vol.) provides that "A parent is the sole natural guardian of the minor child if the other parent . . . dies."

10. References to Erika's name are alternatively spelled as "Erika" or "Erica" throughout the record. We shall use "Erika" for purposes of consistency.

custody because he resided in this State, and under the Uniform Child Custody Jurisdiction and Enforcement Act,

Japan cannot be considered the minor child's home state because the minor child is only physically present in Japan as a result of the maternal grandmother's unjustifiable conduct and because Japan's family court system does not comply with the standards of due process, fundamental fairness and the norms of international comity required by this State.

Ms. Futagi responded to Mr. Toland's complaint and filed a "Motion to Dismiss Custody Proceeding for Lack of Personal Jurisdiction and Pursuant to the Uniform Child Custody Jurisdiction Act of Maryland and For An Award of Counsel Fees under Maryland Statute Section 9.5–208." [11] She attached to a subsequent Memorandum of Law in Support of the Motion to Dismiss an affidavit of her Japanese family law expert, Yori-

---

11. Section 9.5–208 of the Family Law Article provides:
(a) *In general.*—Except as otherwise provided in § 9.5–204 of this subtitle or by other law of this State, if a court of this State has jurisdiction under this title because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct, the court shall decline to exercise its jurisdiction unless:
(1) the parents and all persons acting as parents have acquiesced in the exercise of jurisdiction;
(2) a court of the state otherwise having jurisdiction under §§ 9.5–201 through 9.5–203 of this subtitle determines that this State is a more appropriate forum under § 9.5–207 of this subtitle; or
(3) no court of any other state would have jurisdiction under the criteria specified in §§ 9.5–201 through 9.5–203 of this subtitle.
\* \* \*
(c) *Assessment of expenses and fees.*—(1) If a court dismisses a petition or stays a proceeding because it declines to exercise its jurisdiction under subsection (a) of this section, the court shall assess against the party seeking to invoke the court's jurisdiction necessary and reasonable expenses, including costs, communication expenses, attorney's fees, investigative fees, expenses for witnesses, travel expenses, and child care during the course of the proceedings, unless the party from whom fees are sought establishes that the assessment would be clearly inappropriate. (2) The court may not assess fees, costs, or expenses against this State unless authorized by law other than this title.
Section 9.5–208 of the Family Law Article.

michi Ishikawa,[12] who attested that under Japanese law, Ms. Futagi was awarded guardianship, which neither equates to custody nor prevents Mr. Toland from pursuing custody in Japan, and that notice of the guardianship proceeding to the biological parent was not required. A hearing on the Motion to Dismiss occurred, during which Mr. Toland and his expert on Japanese family law, Mikiko Otani, testified. Ms. Otani confirmed that Japanese law did not require notice of the guardianship proceeding to Mr. Toland and that the guardianship decree did not prevent Mr. Toland from pursuing custody of his daughter in a Japanese court.

Judge Steven G. Salant of the Circuit Court for Montgomery County, the presiding judge, thereafter issued a Memorandum Opinion, which included findings of fact and conclusions of law. The findings of fact are not in dispute before us.[13]

---

**12.** In his affidavit, Mr. Ishikawa summarized his understanding of the facts underlying this case and then explained that Mr. Toland remained able to seek custody of his daughter in Japan, as the guardianship proceeding did not award Ms. Futagi custody of the child:

There is nothing preventing the Father from filing a custody or a guardianship proceeding [in] Japan. The Guardianship that is and has been in place since January, 2008 has no bearing on his ability or right to file a proceeding and seek the custody or guardianship of his minor daughter, Erika Toland.

*       *       *

There is nothing in Japanese law that requires that [Ms. Futagi] or her Attorney give Mr. Toland Notice of the Guardianship. I believe that Mrs. Futagi was at all times represented by a Japanese lawyer that followed Japanese law. Neither of them did anything in violation of Japanese law in obtaining the Guardianship over the child. After the death of the Mother, it is clear that the maternal Grandmother needed legal authority to deal with the child's issues on a day-to-day basis in Japan: to enroll her in school, to obtain necessary medical care for the child as the need may have developed, and the like. The Guardianship did not grant Mrs. Futagi full, permanent custody of the child, and there is nothing in Japanese law related to the Guardianship that would stop or interfere with Mr. Toland's right and ability to pursue custody of the child in the Japanese Courts because of the existence of the Guardianship either when it was formed or now.

**13.** In this case, the parties, their experts and the Circuit Court all appear to agree that the proceeding in Japan at issue awarded Ms.

Judge Salant found that in 1995, Mr. Toland married Etsuko Futagi in Japan and they later had one child, Erika, who was born in Japan and has not left that country. In 2003, Etsuko took Erika, ostensibly without Mr. Toland's consent, to live with her mother Akiko Futagi and later obtained a Japanese divorce decree that awarded the wife custody of Erika. Judge Salant stated:

Plaintiff Peter Paul Toland, Jr. ("Plaintiff") and Etsuko Futagi Toland ("Mother") were married in Japan on March 22, 1995. After the marriage, the Mother and Father continued to live in Japan as a result of the Father's military service. In June 1996, the Father was transferred to Seattle, Washington, where the couple resided for the next three years, until July 1999 when the couple returned to Japan after the Plaintiff was transferred there.

The minor child, Erica Toland ("child"), was born on October 17, 2002 in Japan. Plaintiff contends the child is a United States citizen, whereas Defendant contends the child has dual citizenship in Japan and the United States. The Mother became a United States citizen on April 18, 2003. On July 13, 2003, the Plaintiff returned from work to discover the Mother had left the family home with the child. The Mother filed for divorce and, over the Plaintiff's jurisdictional objection, on September 29, 2005, the Tokyo Family Court issued a decree of divorce awarding the Mother custody of the minor child.

(internal footnotes omitted).

Judge Salant then found that after the wife's death in 2007, Erika remained in Japan with her grandmother, Ms. Futagi, who was awarded guardianship of the child by a Japanese court:

The Mother died on October 31, 2007. Since that time, the child has lived with her maternal grandmother, Akiko

---

Futagi guardianship of the child, rather than custody. At oral argument, however, there was some discussion which drew some confusion, as Mr. Toland, through his counsel, asserted that the Japanese court awarded Ms. Futagi custody.

Futagi ("Defendant") in Japan. The Plaintiff alleges that he has seen the child only twice since July 13, 2003, and the Defendant has continued to deny him all access to the minor child. Defendant posits that Plaintiff last sought to visit the child in September or October 2007, before the Mother's death, and has not requested visitation since that time.

The Plaintiff filed a Complaint to Establish Custody in the Circuit Court for Montgomery County, Maryland on October 2, 2009 (D.E.# 1). After learning that the Defendant had been appointed the legal guardian of the child by the Japanese Court, Plaintiff filed an Amended Complaint to Establish Custody on September 1, 2010 (D.E.# 22) ("Complaint") to incorporate said facts.

(internal footnotes omitted). Judge Salant, in a footnote, observed that Mr. Toland was not notified of the proceeding awarding guardianship to Ms. Futagi:

Plaintiff had no notice of any guardianship proceeding in Japan and therefore did not participate in the guardianship proceeding.

In his conclusions of law, Judge Salant determined that Japan was the home state of Erika under Maryland's version of the Uniform Child Custody Jurisdiction and Enforcement Act, Section 9.5–201(a)(1) of the Family Law Article, because Erika "has lived exclusively in Japan for her entire life":

A court has jurisdiction to make a child custody determination if that State is the home state of the child on the date of the commencement of the proceeding. § 9.5–201(a)(1). "Home state" is defined as the state in which a child lived with a parent or a person acting as a parent for at least 6 consecutive months, including any temporary absence, immediately before the commencement of a child custody proceeding. § 9.5–101(g). The child at issue has lived exclusively in Japan for her entire life. It is uncontested that at no time has the child lived in the State of Maryland. Accordingly, Japan is considered the home state of the child and Japan has jurisdiction to enter a child custody decree pursuant to §§ 9.5–201(a)(1) and 9.5–104(a). At this time,

Japan has not declined to exercise jurisdiction on the ground that Maryland (or any other jurisdiction) is the more appropriate forum, therefore no State other than Japan can claim jurisdiction under § 9.5–201(a)(2)–(a)(3).

Judge Salant then addressed Mr. Toland's argument that Maryland could exercise "vacuum jurisdiction" under Section 9.5–201(a)(4) of the Family Law Article, because Japan should have declined jurisdiction under Section 9.5–208, as Erika's presence in that jurisdiction was allegedly caused by the wife and grandmother's "unjustifiable conduct," when the wife took Erika from their family home in 2003. Without addressing whether their conduct was unjustifiable, Judge Salant concluded that the Circuit Court could not exercise "vacuum jurisdiction" until after Japan declined jurisdiction, which Japan had not done:

Plaintiff argues that despite the above analysis, this Court has jurisdiction pursuant to § 9.5–201(a)(4), often termed the "vacuum jurisdiction" provision, to make an initial custody determination. Plaintiff contends that Japan, even were it to be considered a State for UCCJEA purposes, could not claim home state jurisdiction because such jurisdiction exists solely due to the Mother's, and later the Defendant's, unjustifiable conduct. Plaintiff contends that Japan would be required to decline jurisdiction under § 9.5–208(a) because Japan could only have obtained jurisdiction due to the Mother's and the Defendant's unjustifiable conduct, namely their "surreptitiously removing the minor child" and refusing to allow the Plaintiff contact with the child. Thus, Plaintiff contends that vacuum jurisdiction must apply as there is no other state that would have home state, significant connection, or more appropriate forum jurisdiction.

This Court cannot exercise jurisdiction pursuant to § 9.5–201(a)(4). While Plaintiff's argument that Japan would be required to decline jurisdiction due to the Mother's and the Defendant's unjustifiable conduct may in fact be correct, this Court cannot assume jurisdiction on that supposition alone. The issue of whether Japan would be required to decline jurisdiction under § 9.5–208(a) is for the Japanese

courts to determine. This Court cannot speculate as to a decision that may be made by the Japanese court. Before this Court could exercise jurisdiction pursuant to § 9.5–201(a)(4) Japan would have to decline jurisdiction; as Japan has not done so, this Court cannot exercise subject matter jurisdiction pursuant to § 9.5–201(a)(4).

(emphasis in original).

Judge Salant addressed Mr. Toland's second argument related to the exception to the application of the Maryland Uniform Child Custody Jurisdiction and Enforcement Act, under Section 9.5–104(c) of the Family Law Article, because, allegedly, Japan's child custody laws violate the "fundamental principles of human rights":

Plaintiff's final argument is that this Court is not required to apply the UCCJEA jurisdictional requirements to this case because Japan's custody laws violate fundamental principles of human rights. *See* § 9.5–104(c). Plaintiff's Opposition listed a number of ways in which his, and the child's, rights have allegedly been violated by the Mother, by the Defendant, and by Japanese law. It should first be noted that this Court is **not** determining whether the Plaintiff's or the child's rights have been or would be violated pursuant to Japanese law. Nor is the issue before the Court to determine whether comity would or should be accorded to a child custody determination made in Japan, or whether Japan would accord comity to or enforce a custody determination made pursuant to Maryland law. The sole issue before the Court is whether Japan's child custody law so violates fundamental principles of human rights as to justify employing § 9.5–104(c) and assuming jurisdiction for this custody proceeding.

(emphasis in original). Judge Salant observed that the term "fundamental principles of human rights" was left undefined by the Uniform Child Custody Jurisdiction and Enforcement Act, but that the Comment of the National Conference of Commissioners on Uniform State Laws suggested that fundamental fairness could be included within the term's meaning:

Neither the Comments to the UCCJEA nor Maryland statute or case law define the term "fundamental principles of human rights." While the Comments do note that a court may refuse to apply the UCCJEA when the child custody law of the other country violates "basic principles relating to the protection of human rights and fundamental freedoms," the drafters of the UCCJEA took no position on what laws relating to child custody might violate such "fundamental freedoms." *See* Comments, Section 105: International Application of Act at 14.

Fundamental freedoms, Judge Salant determined, encompassed due process under the United States Constitution, including the fundamental liberty interest of a parent to the care, custody and control of the child:

Fundamental freedoms and liberties frequently arise under a given political system and structure. In the United States, these interests are recognized or established under our constitutional system of government. Under our system of government it has been established that the interest of parents in the care, custody, and control of their children is "perhaps the oldest of the fundamental liberty interests" recognized by the United States Supreme Court. *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054 [147 L.Ed.2d 49] (2000). *See Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258 [138 L.Ed.2d 772] (1997) ("... [T]he 'liberty' specially protected by the Due Process Clause includes the right ... to direct the education and upbringing of one's children."); *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526 [32 L.Ed.2d 15] (1972) ("Th[e] primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625 [67 L.Ed. 1042] (1923) (holding the Due Process Clause of the United States Constitution protects the rights of parents to "establish a home and bring up children" and "to control the education of their own"). *See also Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388 [71 L.Ed.2d 599] (1982); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438 [88

L.Ed. 645] (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571 [69 L.Ed. 1070] (1925). After examining the extensive precedent as cited above, the *Troxel* Court declared it "beyond doubt" that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. 530 U.S. at 66 [120 S.Ct. 2054]. The same right has also been recognized by the Court of Appeals of Maryland which has held that "[a] parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court." *In re Samone H.*, 385 Md. 282, 300, 869 A.2d 370 (2005).

The fundamental liberty interest of a parent in a child, however, is not absolute, according to Judge Salant:

However, such a right is not an absolute right, and may be curtailed by the State where it is in the best interest of the child or necessary for the protection of the child from abuse or neglect. *See In re Adoption/Guardianship No. 3598*, 109 Md.App. 475, 675 A.2d 170 (1996). The Court may award custody to a third party as against a biological parent if the Court finds that the biological parent is unfit or that exceptional circumstances exist to justify such a determination, and that it is in the best interest of the child to do so. *See Ross v. Hoffman*, 280 Md. 172, 372 A.2d 582 (1977) (discussing exceptional circumstances); *Pastore v. Sharp*, 81 Md.App. 314, 567 A.2d 509 (1990[1991] ) (discussing fitness).

The right to "family life" has also been recognized by several international treaties, conventions, and covenants. The Universal Declaration of Human Rights ("Declaration") provides that "[n]o one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honour [sic] and reputation." Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc A/810 at 71 (1948), at art. 12.

Based upon the aforegoing discussion, and the determination that the procedures and considerations for awarding

custody in Japan were akin to the best interests of the child standard in Maryland, Judge Salant held that, because the Japanese custody laws did not violate fundamental fairness, the exception to the international application of the Uniform Child Custody Jurisdiction and Enforcement Act did not apply, and the Circuit Court should not exercise jurisdiction over the present interstate custody dispute:

> Based on the above analysis, the Court does not find that the child custody law of Japan violates the fundamental principles of human rights such as to justify an exercise of § 9.5–104(c).

Judge Salant dismissed Mr. Toland's Complaint to Establish Custody [14] and Mr. Toland timely appealed.

**Discussion**

We initially address whether the Circuit Court, in dismissing Mr. Toland's complaint, violated his due process rights under the Fourteenth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights, as Mr. Toland initially argues in his first question. While we have often stated that the due process clauses of the Fourteenth Amendment and Article 24 may differ in application, *see, e.g., Frey v. Comptroller of the Treasury*, 422 Md. 111, 176–77, 29 A.3d 475, 513 (2011), both clauses are synchronistic in that "[t]he first prerequisite to raising a due process argument is that the action complained of must constitute 'state' action." *Pitsenberger v. Pitsenberger*, 287 Md. 20, 27, 410 A.2d 1052, 1056 (1980), citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Such state action may include a court's recognition and enforcement of a foreign decree. *See Rentals Unlimited, Inc. v. Motor Vehicle Administration*, 286 Md. 104, 111, 405 A.2d 744, 749 (1979) (observing that "the due process clause . . . forbids the recognition and enforcement of a foreign judgment rendered by a court which lacks jurisdiction").

---

14. Judge Salant additionally denied Ms. Futagi's request for attorneys' fees under Section 9.5–208(c)(1) because she did not demonstrate that Mr. Toland acted unjustifiably in bringing his claim.

■ In the present case, however, it is clear that these proceedings do not involve Ms. Futagi seeking to register or enforce the guardianship decree in Maryland, and Judge Salant reviewed the decree at the behest of Mr. Toland only to determine whether Japanese child custody law violated the "fundamental principles of human rights" for purposes of Section 9.5–104(c) of the Family Law Article. Without judicial enforcement of the foreign decree in Maryland, Mr. Toland's due process rights were not implicated by the Circuit Court's consideration of the Japanese decree in the limited context of determining whether the exception under the Maryland Uniform Child Custody Jurisdiction and Enforcement Act applied.

As to Mr. Toland's challenge to the Circuit Court's application of the Uniform Child Custody Jurisdiction and Enforcement Act, we first address whether the Circuit Court properly applied Section 9.5–201(a) of the Family Law Article to conclude that it should not exercise jurisdiction. Under the framework of Section 9.5–201(a), the home state of the child ordinarily has exclusive jurisdiction and it is undisputed that Maryland is not the home state of Erika, because she has never lived in or visited this State.

■ Mr. Toland argues, however, that the Circuit Court should have exercised "vacuum jurisdiction," under Section 9.5–201(a)(4), because Erika's continuous presence in Japan is the result of the unjustifiable conduct of Ms. Futagi and Mr. Toland's ex-wife and therefore requires Japan to decline jurisdiction. He argues that Japan, where Erika has lived for her entire life, is precluded from being considered her home state because "the mother and maternal grandmother, Ms. Futagi, engaged in the unjustifiable conduct of surreptitiously removing the minor child from the Father without his knowledge or consent." This argument has not been proffered to a Japanese court in a custody dispute. The Maryland Uniform Child Custody Jurisdiction and Enforcement Act does not authorize a Maryland circuit court to decline jurisdiction on Japan's behalf. Therefore, Judge Salant's refusal to exercise vacuum jurisdiction under Section 9.5.–201(a)(4) and conclusion that

the Uniform Child Custody Jurisdiction and Enforcement Act applied was appropriate.

■ Alternatively, Mr. Toland asserts that the exception to the application of the Maryland Uniform Child Custody Jurisdiction and Enforcement Act, Section 9.5–104(c), is implicated in this case, by arguing that his fundamental rights as a parent were violated by various aspects of Japanese family law. Initially, he argues that the appointment of Ms. Futagi as guardian of his daughter was an infringement on his fundamental right as a parent to the care, custody and control of his child; thus, the failure to notify him of the proceeding constituted a violation of the "fundamental principles of human rights" and permits the Circuit Court to disregard the ordinary jurisdiction limitations of the Uniform Child Custody Jurisdiction and Enforcement Act.

Ms. Futagi responds, in support of the Circuit Court's dismissal, that Japanese child custody laws are not implicated because the Japanese guardianship decree does not inhibit Mr. Toland's ability to pursue custody of his daughter in Japan.

■ Custody of a child, which is undoubtedly a parental right protected under both the United States Constitution, *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), as well as the Maryland Declaration of Rights, *In re Samone*, 385 Md. 282, 300–01, 869 A.2d 370, 380–81 (2005), encompasses the "care, control, and maintenance of a child." Black's Law Dictionary 441 (9th ed. 2009). Custody generally follows biology, and a biological parent is deemed the natural custodian of a child, *DeGrange v. Kline*, 254 Md. 240, 242, 254 A.2d 353, 354 (1969), and, in custody cases between a parent and a third party, we adhere to the presumption that based on this natural connection, a child's best interests are served by permitting the parent to retain custody of the child. *Koshko v. Haining*, 398 Md. 404, 423, 921 A.2d 171, 182 (2007) ("This presumption is premised on the notion that 'the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to desire and efforts to care

properly for and raise the child, which are greater than another would be likely to display.' ").

A guardianship, in contrast, generally is an outgrowth of a court decree. As we noted in *Kicherer v. Kicherer*, 285 Md. 114, 400 A.2d 1097 (1979), a guardian's role in relation to the child or ward, including the temporality, purpose, and authority of the appointment, is defined by the court:

> Lest sight be lost of the fact, we remind all concerned that a court of equity assumes jurisdiction in guardianship matters to protect those who, because of illness or other disability, are unable to care for themselves. In reality the court is the guardian; an individual who is given that title is merely an agent or arm of that tribunal in carrying our its sacred responsibility.... [A]ll the parties should be reminded that appointment to that position rests solely in the discretion of the equity court and the administering of that office as it pertains to both the person and property of the ward is subject to judicial control.

285 Md. at 118–19, 400 A.2d at 1100–01 (internal citations omitted). In the *Kicherer* case, a husband and son of a mentally-disabled adult woman were appointed co-guardians of her person and property. Although we dismissed as moot each of the co-guardians' appeals, each seeking the termination of the guardianship appointment of the other, we instructed that the lower court, pursuant to its equitable authority, require the co-guardians to file reports and accountings documenting the woman's care regularly, to ensure they carried out their duties properly.

■ A court, therefore, has equitable jurisdiction to appoint a "guardian of the person of a minor simply for the purpose of making a particular type of decision for that minor" or for a number of purposes. *In re Adoption/Guardianship No. 10935*, 342 Md. 615, 628, 679 A.2d 530, 536 (1996); *see* Black's Law Dictionary 774 (9th ed. 2009) (A guardian "may be appointed either for all purposes or for a specific purpose."). In *Wentzel v. Montgomery General Hospital, Inc.*, 293 Md. 685, 447 A.2d 1244 (1982), we ratified the notion that a

grandmother and an aunt of a minor child could petition to be appointed as co-guardians for the purpose of consenting to a proposed surgical procedure for the child.

The role of a guardian is, therefore, separate and distinct from that of a custodian of a child. In *In re Adoption/Guardianship No. 10935*, 342 Md. 615, 679 A.2d 530 (1996), a case involving the resignation of a co-guardian, we reiterated that a parent may name a guardian for his or her child, without termination of a parent's right to custody. *See also* Monrad G. Paulsen and Judah Best, Appointment of a Guardian in the Conflict of Laws, 45 Iowa L.Rev. 212, 213 (1960) ("Legal custody can be given to one person or agency while another remains the guardian.").

In this case, the Japanese decree established a guardianship, as found by the Circuit Court. Ms. Otani, Mr. Toland's expert, and Ms. Ishikawa, Ms. Futagi's expert, confirmed that the guardianship decree was not equivalent to custody and that Mr. Toland remained able to seek custody of Erika. The guardianship, therefore, has not severed Mr. Toland's custodial rights to his daughter and did not implicate "fundamental principles of human rights."

██ Mr. Toland, however, asks us, as he did the Circuit Court, to review all Japanese child custody law, including the methodology and criteria for awarding custody, even though there was no custodial determination in the present case. Any question regarding Erika's custody, which is not ripe, would require us to render an advisory opinion based upon "a matter in the future, contingent and uncertain," which is "a long forbidden practice in this State." *Hickory Point Partnership v. Anne Arundel County*, 316 Md. 118, 129, 557 A.2d 626, 631 (1989), quoting *Boyds Civic Association v. Montgomery County Council*, 309 Md. 683, 690, 526 A.2d 598, 601 (1987) and *Hatt v. Anderson*, 297 Md. 42, 46, 464 A.2d 1076, 1078 (1983).

When we have addressed whether the law of a foreign state is fundamentally unfair in the family law context, we have done so in cases in which the issue was ripe for consideration. In *Aleem v. Aleem*, 404 Md. 404, 947 A.2d 489 (2008), for

example, we considered whether to apply comity and recognize the effect of a husband's performance of *talaq*, which is the recitation of "I divorce thee . . ." three times with the effect under Pakistani law of unilaterally terminating a marriage, during the pendency of a divorce proceeding in the Circuit Court for Montgomery County. The lack and deprivation of basic rights to the wife, as exemplified by the facts of the *Aleem* case, we determined, was contrary to the public policy of this State; we therefore concluded that the *talaq* law was not entitled to comity in this State. 404 Md. at 425–26, 947 A.2d at 502.

We conclude, therefore, that the appointment of Ms. Futagi as Erika's guardian, without severing Mr. Toland's right to custody, did not violate his fundamental rights and that the Section 9.5–104(c) exception to the application of the Uniform Child Custody Jurisdiction and Enforcement Act, allowing for a Circuit Court to exercise jurisdiction despite not being permitted to do so under Section 9.5–201(a), is not applicable. The Circuit Court properly applied the Uniform Child Custody Jurisdiction and Enforcement Act to the present case to dismiss Mr. Toland's complaint; we, therefore, affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**